**"O"**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | SA CR 04-281 AHS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER DENYING DEFENDANTS' |
| | ) | MOTIONS FOR ACQUITTAL AND |
| OLGA LILIA TOSCANO and MARIA | ) | MOTIONS FOR A NEW TRIAL |
| LICEA ROSALES, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND**

Defendants Olga Lilia Toscano ("Defendant Toscano") and

Maria Licea Rosales ("Defendant Rosales") (collectively,

"Defendants") were indicted for one count of conspiracy in

violation of 18 U.S.C. § 371 ("Count 1"), ten counts of mail fraud

in violation of 18 U.S.C. § 1341 ("Counts 2-11"), and one count

each for use of the mails to promote and carry on unlawful activity

in violation of 18 U.S.C. § 1952(a)(3) ("Counts 12-13").  The

Indictment alleged that Defendants, who were "marketers" at

Millenium Outpatient Surgery Center ("MOSC"), illegally recruited

1   patients to undergo unnecessary medical procedures that could be

2   billed to insurance companies at exorbitant rates in exchange for

3   kickbacks, such as money and free or discounted cosmetic surgery.

4          On December 19, 2007, the jury returned verdicts of

5   guilty and not guilty as to some counts, and a mistrial was

6   declared as to others.[1]  Following the trial, "Juror R" disclosed

7   in a declaration that jurors may have consulted the Internet using

8   a wireless device for the meaning of the word "scheme," which was

9   used in the jury instructions.  Other jurors, "Juror P" and "Juror

10  S," denied in their declarations that any extrinsic information was

11  introduced into deliberations.  Juror S was the juror with the

12  wireless device in question, an iPhone.

13         On February 4, 2008, Defendant Rosales filed a Motion for

14  Acquittal or, Alternatively, for a New Trial.  On February 5, 2008,

15  Defendant Toscano filed a Motion for a New Trial.  On April 18,

16  2008, the government filed opposition to all motions.  On May 7,

17  2008, Defendant Rosales filed a reply.  On May 13, 2008, Defendant

18  Rosales filed a corrected reply.  The Court held a hearing on

19  Defendants' motions on May 16, 2008.  At the hearing, Defendant

20  Toscano orally moved to join in Defendant Rosales' Motion for

21  //

22  //

23

24         [1] The jury found Defendant Toscano guilty as to counts 1, 2,
25  7, 9, and 10, and not guilty as to counts 3, 4, and 8.  The jury
    found Defendant Rosales guilty as to counts 1 and 6, and not
26  guilty as to counts 3, 4, and 8.  A mistrial was declared for
    count 6 as to Defendant Toscano and for counts 2, 7, 9, and 10 as
27  to Defendant Rosales.  Counts 5, 11, 12, and 13 were dismissed by
    the government during the course of the trial, prior to the jury
28  verdict.

1    Acquittal.[2]  After hearing testimony from Juror R, the Court took
2    all motions under submission.

3         By this Order, the Court denies the requested acquittals
4    on the basis that when the evidence is viewed in the light most
5    favorable to the government, a rational trier of fact could have
6    found Defendants guilty beyond a reasonable doubt.  The Court finds
7    that Defendants' grounds for a new trial are not well-taken, and,
8    that, among other things, no jury misconduct occurred.

9                                  **II.**

10                    **SUMMARY OF PARTIES' CONTENTIONS**

11   **A.        Defendants' Motions under Federal Rules of Criminal**
12             **Procedure 29(c) and 33**

13        Based on the aforementioned facts, Defendants are
14   entitled to new trials because the jury was improperly exposed to
15   extrinsic information during deliberations and, if necessary, to
16   compel an evidentiary hearing to assess the juror misconduct and
17   its effect on the verdict.  See, e.g., United States v. Rosenthal,
18   454 F.3d 943, 949 (9th Cir. 2006); United States v. Steele, 785
19   F.2d 743, 746 (9th Cir. 1986); Gibson v. Clanon, 633 F.2d 851, 855
20   (9th Cir. 1980).

21        Acquittal or, alternatively, a new trial, is warranted on
22   several additional grounds.  First, the government produced
23   insufficient evidence at trial to support the convictions for

24   _____

25        [2] Because Defendant Toscano joins Defendant Rosales' Motion
     for Acquittal, and because Defendant Toscano did not separately
26   file moving papers or orally state on what grounds she moves for
     acquittal, the Court construes her oral motion to join Defendant
27   Rosales' motion as joining on all grounds raised therein, with
     the exception of those grounds which clearly only apply to
28   Defendant Rosales, as specified in this Order.

                                   3

1  conspiracy and the individual mail fraud counts.  Second, the

2  introduction of evidence at trial, over objection, regarding

3  patients and surgery centers not named in the Indictment

4  constituted a variance that warrants dismissal of the Indictment

5  and/or acquittal.  Third, Defendant Rosales was prejudiced by the

6  Court's denying her motion for severance, in light of testimony

7  that her co-defendant engaged in efforts to influence grand jury

8  testimony and made admissions to other parties.  Fourth, the Court

9  erroneously admitted highly prejudicial lay opinion based on

10  perceptions that they instructed patients to fabricate symptoms

11  when examined by MOSC doctors.  Fifth, the Court erred in allowing

12  and refusing certain jury instructions.  In particular, it was

13  error to instruct the jury that commercial bribery could be a basis

14  to find a conspiracy; that it was error to refuse Defendants'

15  proposed instruction, based on Chiarella v. United States, 445 U.S.

16  222, 100 S. Ct. 1108, 63 L. Ed. 2d 348 (1980), that failure to

17  disclose information cannot constitute fraud unless there is an

18  affirmative duty to disclose; that it was error to deny an

19  instruction regarding the legal effect of kickbacks; and, finally,

20  that it was error to not instruct the jury to acquit Defendants if

21  it found multiple conspiracies or schemes, as opposed to one

22  overall scheme.

23  **B.**        **Government's Consolidated Opposition**

24         Defendants have failed to show, by a preponderance of the

25  evidence, that the jury was exposed to, or considered, extrinsic

26  information during deliberations.  United States v. Caro-Quintero,

27  769 F. Supp. 1564, 1574 (C.D. Cal. 1991).  Even if the alleged

28  juror misconduct took place, the information's introduction to

4

1  deliberations did not prejudice Defendants and, accordingly, does

2  not necessitate further evidentiary proceedings or a new trial.

3  See id.; United States v. Aguirre, 108 F.3d 1284, 1288 (10th Cir.

4  1997).

5         Moreover, Defendants' arguments regarding the sufficiency

6  of the evidence are unfounded, since both direct and circumstantial

7  evidence was presented at trial sufficient for a rational jury to

8  infer Defendants' intent to promote the objects of the conspiracy

9  and to commit mail fraud.  The inclusion of 404(b) and

10 "inextricably intertwined" evidence pertaining to patients and

11 other surgery centers not named in the Indictment did not

12 constitute a prejudicial variance, since the evidence need not

13 support only the conspiracy charged in the Indictment to the

14 exclusion of other possible conspiracies.

15        The Court committed no error in denying Defendant

16 Rosales' motion to sever.  It gave appropriate limiting

17 instructions to the jury regarding what evidence was admissible as

18 to each Defendant.  Zafiro v. United States, 506 U.S. 534, 538,

19 541, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993).  Furthermore, the

20 statements in question were properly received as admissions by a

21 party opponent under either an adoptive admission theory pursuant

22 to Federal Rule of Evidence 801(d)(2)(B) or as a co-conspirator

23 statement under Federal Rule Evidence 801 (d)(2)(E).

24        Finally, the lay opinion of government witnesses was

25 properly admitted under Federal Rule of Evidence 701 and no error

26 occurred in denying Defendants' proposed jury instructions, as each

27 proposed instruction represented an incorrect statement of the law.

28 //

1  **C.        Defendants' Reply**

2         The conflicting statements in the three jurors'

3  declarations warrant holding an evidentiary hearing during which

4  all twelve jurors could be examined.  It is particularly necessary

5  to have a hearing because the portions of the jurors' affidavits

6  which purport to describe the subjective effect of the extrinsic

7  information on other jurors are inadmissible.  <u>Fields v. Brown</u>, 503

8  F.3d 755, 802-803 (9th Cir. 2007).  The Court should additionally

9  grant acquittal or a new trial on the grounds set forth in the

10 original moving papers.

11                              **III.**

12                        <u>**DISCUSSION**</u>

13 **A.        Legal Standards**

14       **1.   Rule 29(c) Motion**

15       A judgment of acquittal under Fed. R. Crim. Proc. 29(c)

16 is improper if the district court finds that, "viewing the evidence

17 in the light most favorable to the government, a rational trier of

18 fact could have found the defendant guilty beyond a reasonable

19 doubt."  <u>United States v. Ching Tang Lo</u>, 447 F.3d 1212, 1221 (9th

20 Cir. 2006); <u>United States v. Alston</u>, 974 F.2d 1206, 1210-11 (9th

21 Cir. 1992).  Stated another way, sufficient evidence exists to

22 support a conviction if the district court concludes that a

23 rational trier of fact "could have found the essential elements of

24 the crime beyond a reasonable doubt."  <u>Ching Tang Lo</u>, 447 F.3d at

25 1225; <u>United States v. Norris</u>, 428 F.3d 907, 914 (9th Cir. 2005).

26 In reviewing a motion for judgment of acquittal, the government is

27 entitled to all reasonable inferences that might be drawn from the

28 evidence.  <u>United States v. Johnson</u>, 804 F.2d 1078, 1083 (9th Cir.

1  1986).  This standard gives "full play to the responsibility of the

2  trier of fact fairly to resolve conflicts in the testimony, to

3  weigh the evidence, and to draw reasonable inferences from basic

4  facts to ultimate facts."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 99 S.

5  Ct. 2781, 319, 61 L. Ed. 2d 560 (1979).

6          **2.   Rule 33 Motion**

7          A district court may vacate a judgment and grant a new

8  trial "if the interest of justice so requires."  Fed. R. Crim. P.

9  33.  "A district court's power to grant a motion for a new trial is

10 much broader than its power to grant a motion for judgment of

11 acquittal."  <u>Alston</u>, 974 F.2d at 1211.  Nevertheless, the Court of

12 Appeals for the Ninth Circuit has stated that a motion for a new

13 trial should be granted "only in exceptional cases in which the

14 evidence preponderates heavily against the verdict."  <u>United States</u>

15 <u>v. Pimentel</u>, 654 F.2d 538, 545 (9th Cir. 1981).

16 **B.      Analysis**

17         **1.   Juror Misconduct**

18         When inquiring into the validity of a verdict after

19 alleged juror misconduct, the Court's analysis must comport with

20 the limitations set forth in Federal Rule of Evidence 606(b):

21              Upon inquiry into the validity of a verdict or
             indictment, a juror may not testify as to any
22           matter or statement occurring during the course
             of the jury's deliberations or to the effect of
23           anything upon that or any other juror's mind or
             emotions as influencing the juror to assent or
24           to dissent from the verdict or indictment or
             concerning the juror's mental processes in
25           connection therewith.  But a juror may testify
             about (1) whether extraneous prejudicial
26           information was improperly brought to the
             jury's attention, (2) whether any outside
27           influence was improperly brought to bear upon
             any juror, or (3) whether there was a mistake
28           in entering the verdict onto the verdict form.

> A juror's affidavit or evidence of any
> statement by the juror may not be received on a
> matter about which the juror would be precluded
> from testifying.

The determination of whether a jury's exposure to extrinsic evidence or other information during deliberations warrants a new trial initially proceeds in two steps. "The first step of the analysis requires the defendants to prove by a preponderance of credible evidence that the jury was exposed to extrinsic evidence." Caro-Quintero, 769 F. Supp. at 1574. "There is no presumption that the jury was exposed to extrinsic information.  In fact, there is an opposite presumption that the jury performed its duties faithfully and diligently."  Id.[3]

If the Court finds the jury was improperly exposed to extrinsic information, the Court must then determine whether such information reasonably could have affected the verdict (not whether it "actually affected" the verdict).  Id.; see also Steele, 785 F.2d at 746 ("The jurors' improper use of the dictionary to determine the precise definition of several words does not require reversal unless there is a reasonable possibility that the extrinsic material could have affected the verdict." (citing United States v. Vasquez, 597 F.2d 192, 193 (9th Cir. 1979))); United States v. Bagley, 641 F.2d 1235, (9th Cir. 1981) (stating Vasquez "reasonable possibility" proper inquiry in examining effect of

---

[3] The analysis appears to be the same whether "evidence" or other types of information are at issue.  See Rosenthal, 454 F.3d at 949 ("Extraneous-evidence cases involve not only the introduction of 'evidence' per se but the 'submission of "extraneous information" (e.g., a file or dictionary) to the jury.'"  (quoting United States v. Madrid, 842 F.2d 1090, 1093 (9th Cir. 1988)).

1  extrinsic material on verdict).  To assess the possibility that the

2  alleged juror misconduct affected the verdict, the Ninth Circuit

3  has stated that "[t]he trial court, upon learning of a possible

4  incident of juror misconduct, must hold an evidentiary hearing to

5  determine the precise nature of the extraneous information."

6  Steele, 785 F.2d at 746.[4]  "An evidentiary hearing must be granted

7  unless the alleged misconduct could not have affected the verdict

8  or the district court can determine from the record before it that

9  the allegations are without credibility."  United States v.

10 Navarro-Garcia, 926 F.2d 818, 822 (9th Cir. 1991).  "The extent of

11 a hearing or the way a hearing is conducted is at the Court's

12 discretion."  Caro-Quintero, 769 F. Supp. at 1570.  A trial judge's

13 determination regarding the likelihood, or lack of likelihood, that

14 extraneous information affected the verdict is reviewed "in the

15 context of the entire record," for the reason that:

16         The trial judge is uniquely qualified to
           appraise the probable effect of information on
17         the jury, the materiality of the extraneous
           material, and its prejudicial nature.  He or
18         she observes the jurors throughout the trial,
           is aware of the defenses asserted, and has
19         heard the evidence.  The judge's conclusion
           about the effect of the alleged juror
20         misconduct deserves substantial weight.

21 Steele, 785 F.2d at 746 (quoting United States v. Bagnariol, 665

22 F.2d 877, 885 (9th Cir. 1981)).

23         If the Court determines there is a reasonable possibility

24 the extrinsic material could have affected the verdict, "[t]he

25 _____

26      [4] Defendants' extensive citation to Fields is to a
    dissenting opinion for the proper uses of juror declarations.
27  503 F.3d at 802-803.  The Court limits its consideration of the
    juror declarations to the uses permitted by Federal Rule of
28  Evidence 606(b).

1  government bears the burden of proving that constitutional errors
2  are harmless beyond a reasonable doubt." Caro-Quintero, 769 F.
3  Supp. at 1574; see also Marino v. Vasquez, 812 F.2d 499, 505 (9th
4  cir. 1987) (hereinafter "Marino," to distinguish from other Vasquez
5  case) ("[U]nauthorized reference to dictionary definitions
6  constitutes reversible error which the State must prove harmless
7  beyond a reasonable doubt."). The government can establish
8  harmless error "by showing that the extraneous material was merely
9  duplicative of evidence introduced in open court," or by showing
10 that "the other evidence amassed at trial was so overwhelming that
11 the jury would have reached the same result even without the
12 extraneous material." Caro-Quintero, 769 F. Supp. at 1574 (citing
13 Hughes v. Borg, 898 F.2d 695, 700 (9th Cir. 1990)).

14                **(a)  No Extrinsic Data Reached the Deliberating Jury**

15             In this case, the evidence of jury misconduct provided to
16 the Court prior to the May 16, 2008 hearing consisted of three
17 juror declarations - the declaration of Juror R, who served as the
18 foreperson, the declaration of Juror S, who is accused of
19 introducing the extrinsic information, and the declaration of Juror
20 P.  The declarations of the latter two jurors directly contradict
21 Juror R's declaration.  Whereas Juror R states that Juror S read
22 "the first couple of sentences" of the definition of the word
23 "scheme," Juror P says that "[a]t no time did [Juror S] read
24 anything from her device to the jury." (Compare Juror R Decl. ¶¶
25 3, 4 with Juror P Decl. ¶ 3).  Juror S likewise asserts that she
26 "did not actually obtain the definition of the word scheme from
27 [her] iPhone" and that she "did not read anything from the iPhone
28 to the other jurors." (Juror S Decl. ¶ 2).

1        The government points out that Juror R does not

2  specifically state what, if any, information was introduced to the

3  jury.  This is accurate:  though Juror R states in his declaration

4  that a definition for "scheme" was read, he does not relate any

5  particular content.  However, the fact that Juror R states that

6  "the first couple of sentences of the definition" of scheme were

7  read to the jury necessarily causes concern.

8        At the May 16, 2008 hearing on the instant motions, the

9  Court permitted Defendants to call Juror R to testify and

10  supplement the evidentiary record regarding the events described in

11  his declaration.[5]  The Court inquired of Juror R regarding the

12  precise nature of the extrinsic information allegedly introduced

13  during deliberations:

14        Court:  Tell us in the best words you can or
           the memory that you have what you heard that
15        juror say when she consulted the electronic
           device?
16

        The Witness:  Scheme.  And then she paused for
17        a moment.  A plan, or group, or set – I'm not
           sure of that word – of plans.  Her next
18        syllable was then "in."  And that was when she
           stopped.
19

20        The Court cannot credit Juror R's statements, in either

21  his declaration or at the May 16, 2008 hearing, in light of the

22  evidence indicating Juror S <u>attempted</u> to obtain extrinsic

23  information but did not actually see the effort to completion.  It

24  is evident from the sworn declarations of Juror P and Juror S that

25  the likely course of events consisted of Juror S volunteering to

26

27      [5] Although it was pointed out by the government that Juror P
  was voluntarily present, Defendants did not call him as a
28  witness.

look up the information and being told not to as she was in the
process of searching for the information.  Though the declarations
of Juror R and Juror S conflict in this regard, the Court finds the
declaration of the juror who actually made use of the iPhone to
give a more credible account of what transpired.  In his
declaration, Juror R states that Juror S read "the first couple of
sentences of the definition" but at the hearing he testified to
having heard only a few words.  Moreover, the facts in the
declaration of Juror S are supported in their entirety by the
description of events in Juror P's declaration.  Accordingly, the
preponderance of the evidence supports a finding by the Court that
the jury was not exposed to a dictionary/Internet definition of
"scheme."  Caro-Quintero, 769 F. Supp. at 1574.  Under the Caro-
Quintero framework, the analysis ends here.  Id.  The Court does so
find.  If the jury was not exposed to the extrinsic information,
the Court can safely conclude that extrinsic information did not
affect the verdict.  Id.; see also United States v. Plunk, 153 F.3d
1011, 1025 (9th Cir. 1998) ("Because none of the jurors in the
instant case ever actually viewed the definition of the word . . .
there could be no reasonable possibility that the evidence affected
the jury's deliberations." (internal quotations and citations
omitted)), overruled on other grounds, United States v. Hankey, 203
F.3d 1160, 1169 (9th Cir. 2000).

> **(b)  No Extrinsic Data Reasonably Could Have Affected the
> Verdict**

Defendants argue that a further hearing involving all
remaining jurors is necessary to determine the effect Juror S's
statement had on other jurors, assuming Juror R's retelling of the

1  deliberation events is true.   However, even assuming the alleged

2  extrinsic information was introduced to the jury, the Court concurs

3  with the government that there is no reasonable possibility such

4  information could have affected the verdict, and that, to the

5  extent it might possibly have, such error would be harmless beyond

6  a reasonable doubt.   Caro-Quintero, 769 F. Supp. at 1575.

7       Accepting Juror R's account, Juror S read the definition

8  of the word scheme as "a plan, or group, or set . . . of plans."

9  The Court defined "scheme to defraud" in Jury Instruction No. 11 as

10 follows:  "A 'scheme to defraud' is any deliberate plan of action

11 or course of conduct by which someone intends to deceive or cheat

12 another or by which someone intends to deprive another of something

13 of value."  (See Court's Jury Instructions, at 15).  The words "a

14 plan, or group, or set . . . of plans" are unambiguously subsumed

15 by the "any deliberate plan of action or course of conduct."  (Id.

16 (emphasis added)).  Even if extrinsic information was introduced to

17 the jury, then, it was, at most, "merely duplicative" of

18 information already available to the jury.  Caro-Quintero, 769 F.

19 Supp. at 1574.

20      Cases cited by Defendants discussing jury misconduct in

21 the form of dictionary consultation do not require a contrary

22 conclusion.  In Gibson, jurors consulted a medical dictionary to

23 obtain information regarding blood type rarity, information which

24 related to evidence previously deemed inadmissible by the Court and

25 which bolstered the credibility of a prosecution witness.  633 F.2d

26 at 855.  In Steele, a copyright infringement prosecution case, the

27 bailiff provided the jury with a common dictionary without first

28 informing the court or the parties – the jurors proceeded to use

the dictionary to search for the definitions of a host of words, including, *inter alia*, "plagiarism," "copyright," "infringement," and "doubt." 785 F.2d at 744. The <u>Steele</u> court, which presents facts regarding dictionary use more akin to those alleged here, found the type of breach in <u>Gibson</u> "readily distinguishable" from its own facts. <u>Id.</u> at 747. Whereas in <u>Gibson</u> the extrinsic dictionary information "bolstered the government's case" by presenting to jurors facts in a manner "not tested for their trustworthiness under our adversarial system of justice," in <u>Steele</u>, where the jury looked to a dictionary for the meaning of words, "no facts were gathered, and no evidence pointing to guilt or discrediting a defense was presented by any of the jurors." <u>Id.</u> Similarly here, no additional facts, much less facts previously deemed inadmissible, are at issue. More importantly, though, in affirming the trial court's denial of defendant's motion for a new trial, the <u>Steele</u> court took note of the fact that many of the words the jurors looked up in the dictionary were "not contrary to any instruction given by the court." <u>Id.</u> Indeed, the court "did not define" these words, even though "they were used in several instructions." In this case, the alleged infraction is much less significant than that in <u>Steele</u>, since the Court here did instruct the jury on the definition of the word scheme as used in its instructions *and* the words proffered by Juror R were "not contrary" to such instructions. (<u>See</u> Court's Jury Instructions, Jury Instruction No. 11, at 15).

Though not cited by Defendants, the Ninth Circuit also dealt with juror use of dictionaries in <u>Marino</u>. 812 F.2d at 505. In <u>Marino</u>, a state murder case before the court on a petition for

writ of habeas corpus, the uncontroverted evidence indicated that a juror, after holding out against a guilty verdict for thirty days, changed his vote to guilty after receiving the dictionary definition for the word "malice." <u>Id.</u>  In finding prejudicial error, the Court observed that the dictionary definition of malice on which the juror relied "differed materially from the trial court's instruction on malice," since the dictionary's definition omitted key elements of the offense, as detailed in the court's instructions. <u>Id.</u> ("The substitute definition included no consideration of the element of intent for the purpose of express malice, nor did it reflect the factors that constitute implied malice, where a killing results from an intentional act involving a high probability that it will result in death, and is done for a base antisocial purpose, and with a wanton disregard of human life."). Unlike in <u>Marino</u>, the juror in the instant case is alleged to have spoken only a few words that did not "differ[]  materially" from the Court's Jury Instructions. <u>See also</u> <u>United States v. Kupau</u>, 781 F.2d 740, 744 (9th Cir. 1986) (finding use of dictionary by jury harmless because "[t]he words whose definitions were ascertained had negligible bearing on the case"); <u>Aguirre</u>, 108 F.3d at 1289 (finding no prejudice after jury used dictionary to search for word "distribution" because court did not believe "the dictionary definition of [the word] differs appreciably or is less demanding than [the] legal definition provided by the district court," such that "to the extent any of the jurors determined [defendant] engaged in distribution under the term's dictionary meaning, they also determined [he] engaged in distribution under its legal definition").

Other factors point to an absence of prejudice.   The government cites to a Tenth Circuit case setting forth a five-factor test for determining whether the prosecution has successfully rebutted the presumption of prejudice arising from the introduction of extraneous information specifically in the form of dictionary definitions.  <u>Aguirre</u>, 108 F.3d at 1288.   Under <u>Aguirre</u>, the Court considers the following:

> (1) The importance of the word or phrase being defined to the resolution of the case. (2) The extent to which the dictionary definition differs from the jury instructions or from the proper legal definition.  (3) The extent to which the jury discussed and emphasized the definition.  (4) The strength of the evidence and whether the jury had difficulty reaching a verdict prior to introduction of the dictionary definition.  (5) Any other factors that relate to a determination of prejudice.

<u>Aguirre</u>, 108 F.3d at 1288.  A similar test (of general applicability) has been used by courts in the Ninth Circuit to assess the effect of extraneous material on jury deliberation.[6]  As to the first <u>Aguirre</u> factor, the government argues that the word "scheme" does not carry the level of importance Defendants assign it because the operative words in the Court's Jury Instructions were "fraud" and "defraud" - words which were typically coupled with the "scheme" in the instructions.  The terms "fraud" and

---

[6] Under Ninth Circuit cases, the Court considers:  "[1] [W]hether the material was actually received and if so how; [2] the length of time it was available to the jury; [3] the extent to which the jurors discussed and considered it; [4] whether the material was reached and if so at what point in the deliberations; and [5] other matters which bear on the issue of reasonable possibility of whether the extrinsic material affected the verdict."  <u>Caro-Quintero</u>, 769 F. Supp. at 1575 (citing <u>Marino</u>, 812 F.2d at 504 (9th Cir. 1987)); <u>see also</u> <u>Plunk</u>, 153 F.3d at 1024-25; <u>Navarro-Garcia</u>, 926 F.2d at 822-23.

"defraud" were clearly important to the resolution of the case, since they served as the key qualifiers to the term "scheme." However, the meaning of "scheme," even when coupled with the words "fraud" and/or "defraud," is also independently important to the case, since it is used in the Court's Jury Instructions - particularly, Jury Instructions Nos. 9, 10, 11, and 12 - to describe the relevant culpable conduct the jury was tasked with finding when reviewing the evidence. (See Court's Jury Instructions, at 12-16). Accordingly, while not singularly important, "scheme" was an important term in the Court's Jury Instructions and, consequently, to the resolution of the case. Aquirre's first factor supports Defendants' position.

The second Aquirre factor does not counsel in favor of finding prejudice, however. As discussed above, the dictionary definition which Juror R asserts was introduced to the jury was not inconsistent with the definition provided in the Court's Jury Instructions, but rather, was encompassed by it.

The third Aquirre factor disfavors a finding of prejudice as well. The declarations of Juror P and Juror S are both in agreement that the incident at issue as described by Juror R did not occur because Juror S immediately complied with the foreperson's request that she not use her electronic device to attempt to consult extrinsic information. (Juror P Decl. ¶¶ 2, 3; Juror S Decl. ¶ 2). Juror R's account contradicts the accounts of Jurors P and Juror S, but his declaration omits the definition he claims was verbalized. Juror R did not supply the definition he claims he heard until weeks later at the May 16, 2008 hearing. As already stated, in light of the contrary evidence provided by the

1  other two jurors, the Court finds it doubtful Juror R is correct

2  and highly likely Juror P and Juror S are accurate in their account

3  of what transpired with Juror S's iPhone.

4          As to the fourth <u>Aguirre</u> factor, which relates to the

5  strength of the evidence, the government argues, and the Court

6  agrees, that the evidence from which the jury could infer

7  Defendants' guilt was quite strong.  It included, *inter alia*,

8  testimony of witnesses who were recruited by Defendants for

9  unnecessary medical procedures in exchange for money or cosmetic

10  surgery; testimony of multiple witnesses that they learned of

11  Defendants through employees of companies at which Defendants

12  worked or recruited other employees; testimony of multiple

13  witnesses that Defendants coached patients to state false symptoms;

14  testimony that Defendants falsely told patients they would not be

15  responsible for insurance co-payments; evidence that Defendants

16  knew claim packets containing false information regarding patients'

17  symptoms and co-pay responsibility would be sent to insurance

18  companies using the mails; and, witness testimony regarding

19  Defendants' admitting to knowing the fraudulent nature of their

20  marketing practices at MOSC.  A finding that the "other evidence

21  amassed at trial was so overwhelming that the jury could have

22  reached the same result even without the extraneous material"

23  suffices, in itself, to establish harmless error.  <u>Caro-Quintero</u>,

24  769 F. Supp. at 1574.

25          The Court finds an absence of prejudice to Defendants

26  even assuming the extrinsic information was received and considered

27  by the jury.  The same result obtains under the Ninth Circuit's

28

1  more general test.[7]  Id. at 1575.  If Juror R's account is taken as

2  true, "the length of time [the definition] was available to the

3  jury" and "the extent to which the jurors discussed and considered"

4  the definition was extremely brief.  Id.  According to Juror R's

5  testimony, Juror S stopped talking and put away her iPhone after

6  stating only a few words.  This is insignificant when compared to

7  the facts of Steele, for example, where a dictionary was available

8  to the jury for "approximately two hours."  785 F.2d at 745.  As

9  such, the first three factors of the Ninth Circuit's test disfavor

10  a finding of prejudice.  Caro-Quintero, 769 F. Supp. at 1575.  As

11  to the fourth factor, regarding the timing of the extrinsic

12  material's introduction, Juror R's account of events states that

13  the material came toward the end of deliberations.

14       In sum, the Court finds that no extrinsic information

15  reached the jury.  The Court further finds that even if the alleged

16  extrinsic information did reach the jury, it could not reasonably

17  have affected the verdict and that the government has proven beyond

18  a reasonable doubt that any such influence was harmless.

19       Defendants' request for an evidentiary hearing, in

20  addition to that already had with Juror R, is denied.  The Court in

21  denying Defendants' motion has already considered a scenario where

22  all jurors were exposed to and considered the information Juror R

23  claims was introduced during deliberations and finds no possibility

24  of prejudice to Defendants.  Holding further evidentiary

25  proceedings with the nine remaining jurors, within the confines of

26  Fed. R. Evid. 606(b), will not likely produce additional

27  _____

28       [7] See Footnote 6, *supra*.

19

1  information, given the evidence of record.  The law does not

2  encourage inquiry into jury room deliberations - a procedure that

3  historically derives its effectiveness from the assurance to jurors

4  of the confidentiality of their discussions - when it is

5  overwhelmingly clear a further evidentiary hearing would be

6  fruitless.

7                **2.   Sufficiency of the Evidence**

8            Defendants argue the government was required to show

9  Defendants committed or conspired to commit commercial bribery, but

10 that there is "no evidence that the patients were using their

11 respective positions as employees in any corrupt way." (See

12 Motion, at 7).  The government contends that testimony against

13 Defendants to the effect that they recruited insured employees,

14 coached them so that they exaggerated symptoms, and promised them

15 they would not be responsible for co-payments, as well as other

16 evidence, sufficiently allowed the jury to infer the Defendants'

17 intent to induce employees to defraud their employers. (See

18 Opposition, at 7-8).  The elements of commercial bribery, set forth

19 in the Court's Jury Instruction No. 8, hold that a person is guilty

20 of the offense if she "offers or gives an employee money or

21 anything of value" without "the knowledge or consent of the

22 employer," in exchange for "the employee using his or her position

23 to benefit that other person." (See Court's Jury Instructions, at

24 10).  The evidence identified by the government provides a

25 sufficient evidentiary basis from which a jury could find these

26 elements were satisfied.

27            Defendants also claim the government produced

28 insufficient evidence that they knew about MOSC's billing and

mailing procedures and, accordingly, lacked the requisite knowledge

to support a conspiracy conviction.  This argument is unavailing.

The government produced testimony from co-employees that Defendants

knew insurance claims packages containing false information would

be mailed.  Moreover, the insurance forms Defendants completed with

patients made it clear on their face that they were to be mailed.

Defendants additionally challenge the government's theory

that they had knowledge of an ongoing conspiracy because they

failed to disclose the "kickbacks" patients received for undergoing

medical procedures.  Defendants rely on Chiarella to argue that a

specific duty to disclose is required to support criminal liability

for failing to disclose kickbacks and that the Court should have

supplied an instruction to this effect.  445 U.S. at 235.

Chiarella, however, specifically interprets the Securities Exchange

Act and does not require the instruction requested by Defendants.

This argument does not support an acquittal or a new trial.

Lastly, Defendants raise an argument regarding the

existence of multiple conspiracies.  Specifically, they argue the

evidence presented supports a finding of several conspiracies,

rather than just one overall conspiracy.  From a sufficiency of the

evidence perspective, government's point in opposition is well-

taken – the evidence does not have to exclude every hypothesis

except guilt, rather, the inquiry is whether a jury could

reasonably arrive at its verdict from the evidence.  United States

v. Mares, 940 F.2d 455, 458 (9th Cir. 1991).  Though Defendants

argue that the evidence can be interpreted in such a way as to

support multiple minor conspiracies rather than just one, this does

not necessarily exclude the possibility that a jury could have

1   reasonably interpreted the evidence differently in finding one

2   overall conspiracy which included both Defendants.

3           The Ninth Circuit Model Jury Instructions ("MJI") include

4   a multiple conspiracies instruction echoing Defendants' concerns.

5   See MJI 13.3.  The instruction states (with emphasis added):

6           You are further instructed, with regard to the
            alleged conspiracy offense, that proof of
7           several separate conspiracies is not proof of
            the single, overall conspiracy charged in the
8           indictment *unless one of the several
            conspiracies which is proved* is the single
9           conspiracy which the indictment charges.  What
            you must do is determine whether the single
10          conspiracy charged in the indictment existed
            between two or more conspirators.  If you find
11          that no such conspiracy existed, then you must
            acquit the Defendants of that charge.  However,
12          if you decide that such a conspiracy did exist,
            you must then determine who the members were;
13          and, if you should find that a particular
            Defendant was a member of some other
14          conspiracy, not the one charged in the
            indictment, then you must acquit that
15          Defendant.

16          In other words, to find a defendant guilty you
            must unanimously find that such a defendant was
17          a member of the conspiracy charged in the
            indictment and *not a member of some other
18          separate conspiracy*.

19  The MJI is at odds with Defendants' argument that the jury should

20  have been instructed regarding "the requirement of an acquittal if

21  multiple conspiracies or schemes were found, instead of one overall

22  scheme as alleged" in the Indictment.  (See Motion, at 15).

23  Instead, the MJI supports government's position.  Additionally, the

24  Ninth Circuit has held as follows in response to similar arguments:

25          [W]e view the question of whether a single
            conspiracy has been proved, rather than
26          multiple conspiracies, as essentially that of
            sufficiency of the evidence.  The evidence need
27          not be such that it excludes every hypothesis
            but that of a single conspiracy; rather, it is
28          enough that the evidence adequately supports a

1  finding that a single conspiracy exists.

2  United States v. Kenny, 645 F.2d 1323, 1335 (9th Cir. 1981); see

3  also United States v. Bibbero, 749 F.2d 581, 586 (9th Cir. 1984)

4  (same).  The Court finds the evidence produced at trial was

5  sufficient to find the single conspiracy alleged in the Indictment,

6  even if, in addition, it lent itself to other possibilities.

7  Defendants' argument, as such, does not compel the relief they

8  seek.

9      Defendants rely on the same arguments regarding the

10  insufficiency of the evidence for the conspiracy count as they do

11  for the individual mail fraud counts.  Accordingly, neither a

12  judgment of acquittal or a new trial are warranted on these bases.

13      **3.  Variance**

14      Defendants' variance argument mirrors their argument

15  regarding the insufficiency of the evidence.  To the extent

16  Defendants argue there was material variance because of the

17  existence of "multiple conspiracies," this argument, for the

18  foregoing reasons, is rejected.

19      Defendants' reply papers supplement their argument by

20  contending that a material variance additionally occurred because

21  "other acts" and/or "inextricably intertwined" evidence admitted at

22  trial impermissibly broadened the scope of the Indictment.  The

23  Jury Instructions, they additionally claim, were ineffective in

24  limiting the jury's reliance on such evidence.  Defendants'

25  objections to the admission of the other acts or inextricably

26  intertwined evidence essentially challenges the Court's ruling on

27  //

28  //

the parties' motions *in limine*.[8]  As an initial matter, Defendants appear to overstate the importance of the government's references to this evidence in closing arguments.  (Reporter's Transcript, Dec. 17, 2007, Vol. 1, at 67-68).  Though the government did refer to this evidence in closing, the jury was only required to find the performance of one overt act for the purposes of finding a conspiracy.  (See Court's Jury Instructions, at 7).  It is more than reasonable, especially when the evidence is viewed in favor of the government, that the jury could have concluded that the acts which served as the basis for the mail fraud convictions (and which were alleged in the Indictment) could have constituted these overt acts.

Defendants contend the Indictment's alleged "broadening" prejudiced their substantial rights because it gave them inadequate time to prepare a defense.  The government, however, provided the requisite notice of its intent to introduce such evidence.  (See Docket No. 148).  Since the government complied with the Federal Rules of Evidence's notice requirement, and consistent with the Court's previous determination that the evidence in question constitutes permissible other acts and/or inextricably intertwined evidence, Defendants' arguments are unavailing.  See Fed. R. Evid. 404(b) (requiring that the prosecution provide "reasonable notice" of intention to introduce 404(b) other acts evidence).[9]

---

[8] Defendants distinguish the evidence admitted by the Court as either "inextricably intertwined" or Rule 404(b) evidence, but the Court's order found the evidence admissible on both grounds.

[9] The Rule 404(b) notice sent by the government also indicates it would seek to have the evidence in question introduced as "inextricably intertwined" evidence.

### 4.   Severance

Defendant Rosales contends evidence relating to Witness Cornejo's testimony and evidence that her co-defendant, Defendant Toscano, attempted to influence grand jury witnesses warranted severance.  Severance of a trial with multiple defendants is appropriate when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  Zafiro, 506 U.S. at 539.  A serious risk might occur when a jury considers evidence against a defendant that would not have been admissible if the "defendant were tried alone," such as evidence of a co-defendant's "wrongdoing."  Id.  However, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice."  Id.  Here, the Court provided such a limiting instruction.  Jury Instruction No. 35 clearly delineated how Witness Cornejo's testimony could and could not be used.  (See Court's Jury Instructions, at 40).  The Court, additionally, provided a limiting instruction during trial as to the grand jury tampering issue and invited the parties to submit further instructions for the Court's review.  None were submitted.  This issue does not warrant acquittal or a new trial.

### 5.   Lay Opinion Evidence

Defendants suggest the testimony from witnesses about what they heard Defendants tell patients while they were waiting to see a doctor at MOSC constituted inadmissible lay opinion. Federal Rule of Evidence 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or

inferences which are (a) rationally based on
the perception of the witness, (b) helpful to a
clear understanding of the witness' testimony
or the determination of a fact in issue, and
(c) not based on scientific, technical, or
other specialized knowledge within the scope of
Rule 702.

"The admission of lay opinion testimony is within the

broad discretion of the trial judge and not to be disturbed unless

it is manifestly erroneous." United States v. Simas, 937 F.2d 459,

464 (9th Cir. 1991).  A witness' "understanding of . . . words and

innuendo" can be helpful to a jury in determining what defendant

meant to convey when she was speaking.  Id.  Testimony is not

helpful within the meaning of Rule 701 when it simply tells the

jury "what result to reach." United States v. Koon, 34 F.3d 1416,

1430 (9th Cir. 1994), reversed on other grounds, 518 U.S. 81, 116

S. Ct. 2035, 135 L. Ed. 2d 392 (1996) (reversing as to sentencing

guideline departures).  Defendants contend the testimony was unduly

speculative because the witnesses often were not able to connect

their impressions to particular patients.  While it is true this

injects some level of ambiguity to the testimony, it is not true

that it renders the witnesses' perception of the overheard

statements themselves unhelpful to the jury.  The Court's admission

of the challenged testimony was thus not "manifest[] error[]" and

does not merit acquittal or a new trial.  Simas, 937 F.2d at 464.

### 6.   Jury Instructions

Defendants raise several objections relating to the

Court's Jury Instructions, all of which have previously been

overruled by the Court.  For reasons discussed in other sections of

this order, the contention that the Court erred in regard to

instructing the jury on commercial bribery, that it erred in not

1  providing an instruction based on <u>Chiarella</u>, and that it erred in

2  not instructing regarding multiple conspiracies, are not well

3  founded.  Defendants additionally contend the Court committed error

4  in not using the following proposed instruction:

5          The mere payment of a 'kickback' does not
           constitute health care fraud; there must in
6          addition be an affirmative act of false or
           fraudulent representation in relation to said
7          'kickback.'

8          It was not error to omit this instruction.  The

9  Indictment did not charge the Defendants with health care fraud,

10 which is a separate offense.  <u>See</u> 18 U.S.C. § 1347.  Moreover, the

11 case on which Defendants rely in support of this instruction

12 expressly limits its discussion regarding kickbacks to its specific

13 facts.  <u>United States v. Medina</u>, 485 F.3d 1291, 1298 (11th Cir.

14 2007).  Defendants are not entitled to acquittal or a new trial on

15 this basis.

16                              **IV.**

17                           <u>**CONCLUSION**</u>

18         The Court denies Defendants' motions for acquittal.  When

19 the evidence is viewed in the light most favorable to the

20 government, a rational trier of fact could have found Defendants

21 guilty beyond a reasonable doubt.  The Court also denies

22 Defendants' motions for a new trial.

23         IT IS SO ORDERED.

24         IT IS FURTHER ORDERED that the Clerk shall serve a copy

25 of this Order on counsel for all parties in this action.

26         DATED:  June 10, 2008.

27                                   ALICEMARIE H. STOTLER
                                    _____
                                    ALICEMARIE H. STOTLER
28                                   CHIEF U.S. DISTRICT JUDGE