1   ANDRÉ BIROTTE JR.
    United States Attorney
2   DENNISE D. WILLETT
    Assistant United States Attorney
3   Chief, Santa Ana Branch Office
    JEANNIE M. JOSEPH (#180399)
4   Assistant United States Attorney
        Ronald Reagan Federal Bldg. and U.S. Dist. Courthouse
5       411 W. 4th Street, Suite 8000
        Santa Ana, California  92701
6       Telephone:  (714) 338-3576
        Facsimile:  (714) 338-3708
7       Email:  jeannie.joseph@usdoj.gov

8   Attorneys for Plaintiff
    UNITED STATES OF AMERICA

9

10                  UNITED STATES DISTRICT COURT

11              FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                      SOUTHERN DIVISION

13  OLGA LILIA TOSCANO,          ) No. SA CV 12-78-AHS
                                 ) (SA CR 04-281-AHS)
14       Defendant-Petitioner,   )
                                 ) GOVERNMENT'S OPPOSITION TO
15            v.                 ) DEFENDANT'S MOTION FOR RELIEF
                                 ) PURSUANT TO 28 U.S.C. § 2255;
16  UNITED STATES OF AMERICA,    ) DECLARATIONS; EXHIBITS
                                 )
17       Plaintiff-Respondent.   )
                                 )
18  ─────────────────────────────)

19

20       Plaintiff-Respondent, by and through its attorney of record,

21  the United States Attorney for the Central District of

22  California, hereby files its opposition to Defendant-Petitioner

23  OLGA LILIA TOSCANO's motion for relief pursuant to 28 U.S.C.

24  § 2255 ("2255 Motion").

25  / / /

26  / / /

27  / / /

28  / / /

                            -1-

1    The government's opposition is based on the attached

2  memorandum of points and authorities, the attached declarations

3  and exhibits, and the records and files in this case.

4  Dated:  April 23, 2012          Respectfully submitted,

5                                  ANDRÉ BIROTTE JR.
                                    United States Attorney
6
                                    DENNISE D. WILLETT
7                                   Assistant United States Attorney
                                    Chief, Santa Ana Branch Office
8

9                                   _____/S/_____
                                    JEANNIE M. JOSEPH
10                                  Assistant United States Attorney

11                                  Attorneys for Plaintiff
                                    United States of America
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

DESCRIPTION                                                         PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . ii

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . 1

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . 1

II.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . 1

     A.   Introduction . . . . . . . . . . . . . . . . . . 1

     B.   Trial Evidence . . . . . . . . . . . . . . . . . 2

     C.   Conviction and Sentencing . . . . . . . . . . . 3

     D.   Appeal and Post-Conviction Agreement . . . . . . 5

III. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . 12

     A.   Defendant's 2255 Motion Is Untimely and Should
          Be Dismissed . . . . . . . . . . . . . . . . . 12

          1.   Defendant did not timely file within one
               year . . . . . . . . . . . . . . . . . . 12

          2.   Defendant is not entitled to equitable
               tolling . . . . . . . . . . . . . . . . 15

     B.   Defendant Has Not Met the Strickland Test to
          Establish Ineffective Assistance of Counsel . . . . 16

          1.   The standard of review is highly
               deferential . . . . . . . . . . . . . . 16

          2.   Mr. Allenbaugh's performance was not
               unreasonable or deficient . . . . . . . . 18

          3.   There is no reasonably probability of a
               different result . . . . . . . . . . . . 20

     C.   Defendant Has Not Established Misconduct By
          The Government . . . . . . . . . . . . . . . . 21

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . 22

**TABLE OF AUTHORITIES**

DESCRIPTION                                                    PAGE

CASES:

Calderon v. United States District Court (Beeler),
        128 F.3d 1283 (9th Cir. 1997) . . . . . . . . . . .    15

Calderon v. United States District Court (Kelly),
        163 F.3d 530 (9th Cir. 1998) . . . . . . . . . . . .   15

Corjasso v. Ayers,
        278 F.3d 874 (9th Cir. 2002) . . . . . . . . . . .    15

Frye v. Hickman,
        273 F.3d 1144 (9th Cir. 2001) . . . . . . . . . . .   16

Kimmelman v. Morrison,
        477 U.S. 365 (1986) . . . . . . . . . . . . . . . .   17

Laws v. Lamarque,
        351 F.3d 919 (9th Cir. 2002) . . . . . . . . . .   15, 16

Lott v. Mueller,
        304 F.3d 918 (9th Cir. 2002) . . . . . . . . . . .    16

Miles v. Prunty,
        187 F.3d 1104 (9th Cir. 1999) . . . . . . . . . . .   16

Miranda v. Castro,
        292 F.3d 1063 (9th Cir.) . . . . . . . . . . . . .    16

Spitsyn v. Moore,
        345 F.3d 796 (9th Cir. 2003) . . . . . . . . . . .    15

Strickland v. Washington,
        466 U.S. 668 (1984) . . . . . . . . . . . . . . . passim

United States v. Battles,
        362 F.3d 1195 (9th Cir. 2004) . . . . . . . . . . .   15

United States v. Claiborne,
        870 F.2d 1463 (9th Cir. 1989) . . . . . . . . . . .   17

United States v. Marolf,
        173 F.3d 1213 (9th Cir. 1999) . . . . . . . . . . .   15

United States v. Schwartz,
        274 F.3d 1220 (9th Cir. 2001) . . . . . . . . . . .   15

ii

**TABLE OF AUTHORITIES (Cont'd)**

<u>DESCRIPTION</u>                                                    PAGE

<u>STATUTES</u>:

18 U.S.C. § 3553  . . . . . . . . . . . . . . . . . .  passim

28 U.S.C. § 2255  . . . . . . . . . . . . . . . . . .  passim

28 U.S.C. § 2255(f)(1)  . . . . . . . . . . . . . . . .  12

28 U.S.C. § 2255(f)(2)  . . . . . . . . . . . . . . . .  13

28 U.S.C. § 2255(f)(3)  . . . . . . . . . . . . . . . .  14

28 U.S.C. § 2255(f)(4)  . . . . . . . . . . . . . . . .  14

<u>RULES</u>:

Fed. R. Crim. P. 35 . . . . . . . . . . . . . . . . . .  passim

MEMORANDUM OF POINTS AND AUTHORITIES

I

INTRODUCTION

Defendant OLGA LILIA TOSCANO ("defendant") seeks in her 2255 Motion to reduce her 78-month sentence to 30 months, alleging that her attorney was ineffective in obtaining, and government counsel engaged in misconduct for failing to make, a Rule 35 motion for a reduced sentence after her conviction in a federal white collar criminal case.  As an initial matter, defendant's 2255 Motion is untimely and should be dismissed.  In addition, defendant's 2255 Motion fails on the merits.  Defendant's counsel, an attorney who specializes in federal white collar criminal defense, was not ineffective in determining that defendant had a better chance to reduce her sentence through post-conviction cooperation, rather than through a direct appeal of the reasonableness of her sentence.  Nor did the government engage in misconduct by not bringing a Rule 35 motion, as defendant ultimately did not provide substantial assistance to the government.  Thus, defendant's 2255 Motion should be denied.

II.

STATEMENT OF FACTS

**A.    Introduction**

This was a conspiracy and mail fraud prosecution against defendant, as well as four other co-conspirators (collectively, "defendants"), for their participation in a scheme to defraud patients and health insurers in connection with outpatient

medical procedures.  (CR 1.)[1]  Using false statements, and
promises of cash and discounted cosmetic surgery, defendants
induced patients to use their health insurance to undergo
unnecessary, risky, and overpriced diagnostic procedures such as
endoscopies ("EGDs"), colonoscopies, and laparoscopies.  (Id.)

On November 13, 2007, the matter proceeded to trial against
defendant and co-defendant MARIA LICEA ROSALES ("ROSALES").  (CR
170.)

**B.   Trial Evidence**

At trial the evidence showed, among other things, as
follows:  Millennium Outpatient Surgery Center ("MOSC") was being
used to commit health care-related fraud involving the U.S.
mails.  Co-defendant THU NGOC PHAM ("PHAM") was the owner and
operator of MOSC.  Defendant, ROSALES, and co-defendant ESMERELDA
ORTIZ TELLO were marketers for MOSC who illegally recruited
patients by offering them kickbacks, such as money and free or
discounted cosmetic surgeries, in exchange for undergoing
invasive and unnecessary medical procedures such as EDGs,
colonoscopies, and laparoscopies, which could be billed at
exorbitant rates to a patient's PPO health insurance.

Defendants also had employees at various businesses act as
sub-marketers for them to recruit other employees at those
businesses to be patients of MOSC, as well as other surgery
centers.  Defendants coached patients to state to doctors false
symptoms that they did not have in order to fabricate medical

---

[1]   "CR" refers to the clerk's record in U.S. v. Millennium,
et al., SA CR 04-182-AHS.

necessity for the functional procedures billed to health
insurance companies.  Further, defendants represented to patients
that MOSC would not collect the portion of the charges for the
medical procedures that would be the patient's responsibility
under their insurance plan; at the same time, defendants
represented to insurance companies that patient's were advised of
their responsibility for these charges.

Defendants knew and caused the mails to be utilized in
connection with billing the insurance companies, submitting
claims information and supporting documentation, and submitting
the patients' signed Explanation of Insurance Benefits Forms
containing false statements about patients' symptoms and false
promises to pay large percentages of MOSC's exorbitant charges.
Defendants mislead patients about their true financial liability,
and medical and financial risks, of participating in the scheme.

Defendants unlawfully paid kickbacks to their recruited
patients.  For the first part of the scheme, PHAM paid the
marketers and other patient recruiters in cash.  Later, the
marketers were paid with checks.  Not including cash from PHAM,
defendant made approximately $890,000 ($200,000 for MOSC
recruited patients and $693,000 from Unity Surgery Center).  PHAM
also would compensate the marketers and other patient recruiters
by directly paying for various bills.

During the scheme, defendant told her roommate that she
believed what they were doing was fraudulent and illegal.

C.   **Conviction and Sentencing**

On December 19, 2007, defendant and ROSALES were convicted
by a jury of conspiracy to commit mail fraud and to use the mails

-3-

1  to promote commercial bribery from approximately January 1, 2000
2  to March 17, 2004 in connection with their roles as marketers for
3  MOSC.  (CR 216.)  In addition, defendant was convicted of four
4  substantive counts of mail fraud.  (Id.)  On June 10, 2008, the
5  Court denied defendant's motion for judgment of acquittal and
6  motion for new trial.  (CR 294).

7       Defendant was sentenced on November 21, 2008.  (CR 329.)  In
8  connection with sentencing, defendant contested a number of
9  sentencing enhancements, including loss, reckless risk of death
10  or serious bodily injury, role, and obstruction of justice;
11  defendant also made arguments regarding application of 18 U.S.C.
12  § 3553 factors.  (Criminal Minutes Re: Sentencing, attached as
13  Exhibit E to the Declaration of Jeannie M. Joseph ("Joseph
14  Decl.") p. 1-3, 9.)  The Court found - under a heightened clear
15  and convincing standard - that actual loss was approximately $1.6
16  million based upon MOSC records showing that this was the amount
17  paid by health insurance companies for surgeries on patients
18  specifically recruited by defendant for a limited time period
19  (less than the total time period of the scheme).  (Id. at p. 6-
20  7.)  The Court did not use intended loss, which was recommended
21  by the U.S. Probation Office in the Pre-Sentence Report, of
22  approximately $4.9 million that was billed to insurance companies
23  for these same patients during the limited time period.  (Id.)
24  The Court did not apply enhancements for reckless risk of death
25  or serious bodily injury or obstruction of justice, but did apply
26  a role adjustment because defendant recruited accomplices to the
27  scheme.  (Id. at p. 7-8.)  The Court also considered personal
28  characteristics of defendant, including her family situation and

-4-

1  employment history.  (_Id._ at p. 9-10.)   While noting defendant's

2  sentencing range under the Guidelines to be 78-97 months

3  imprisonment, the Court sentenced defendant to 78 months

4  imprisonment based upon a consideration of 18 U.S.C. § 3553

5  factors "without reference to the Guidelines range."  (_Id._ at p.

6  9.)   The judgment was entered on November 25, 2008.  (CR 330.)

7  **D.   Appeal and Post-Conviction Agreement**

8       Defendant retained attorney Mark H. Allenbaugh's law firm,

9  which specialized in federal white collar criminal defense and

10  sentencing, to handle her federal case post-conviction ("Federal

11  Case"), as well as a related prosecution in state court ("State

12  Case").  (Declaration of Mark H. Allenbaugh ("Allenbaugh Decl.")

13  ¶¶ 1-3.)   When he was retained, Mr. Allenbaugh reviewed the trial

14  and sentencing records in defendant's Federal Case for any

15  potential appellate issues, and found no appealable trial errors

16  to challenge defendant's conviction.  (_Id._ at ¶ 4.)

17  Mr. Allenbaugh determined that the only possible avenue of appeal

18  was a general appeal of the reasonableness of defendant's 78-

19  month sentence. (_Id._)  Subsequently, Mr. Allenbaugh conferred

20  with defendant about his findings and related to defendant that,

21  given the discretion judges are allowed at sentencing, a direct

22  appeal of her sentence had only a very slim likelihood of

23  resulting in a remand for re-sentencing, and that typically the

24  Ninth Circuit takes two years to decide an appeal, although it

25  could be longer.  (_Id._)  Defendant decided to have Mr. Allenbaugh

26  file (on her behalf) a direct appeal of the reasonableness of her

27  sentence.  (_Id._)  On or about April 29, 2009, Mr. Allenbaugh

28  filed an appeal of defendant's sentence based upon:  the

-5-

irrationality of Sentencing Guidelines Section 2B1.1, the
evidentiary standard applied at defendant's sentencing, the
calculation of loss, and the applicability of 18 U.S.C. § 3553
factors.  (<u>Id.</u> at ¶ 5; Opening Brief attached as Exhibit F to
Joseph Decl.)

However, given Mr. Allenbaugh's assessment of defendant's
unlikely chance of success on direct appeal, Mr. Allenbaugh
suggested to defendant that she try to provide cooperation to the
government to obtain a post-conviction reduction in her sentence
pursuant to Rule 35 of the Federal Rules of Criminal Procedure
("Rule 35 Motion").  (Allenbaugh Decl. ¶¶ 6, 10.)  Defendant was
interested in pursuing a Rule 35 Motion.  (<u>Id.</u> at ¶ 6.)  Thus,
Mr. Allenbaugh questioned defendant about any subject on which
she could provide cooperation to the government of criminal
wrongdoing by others, both related to the State Case and Federal
Case, as well as unrelated matters.  (<u>Id.</u>)  Thereafter, on or
about May 4, 2009, Mr. Allenbaugh sent a letter to the Assistant
United States Attorney ("AUSA") who handled defendant's case,
Kenneth B. Julian, and outlined the potential cooperation that
defendant could provide to the government.  (<u>Id.</u>; Exhibit A
attached to Allenbaugh Decl. ¶ 6.)  The potential cooperation
that Mr. Allenbaugh outlined included a specific list of targets
related to the MOSC scheme charged in the State Case and Federal
Case, as well as "further information of individuals and
organizations unrelated" to the State Case and Federal Case.
(<u>Id.</u>)

AUSA Julian responded to Mr. Allenbaugh's letter, indicating
that he was interested in potential cooperation by defendant, but

-6-

1  that defendant would have to enter into a Post-Conviction

2  Agreement and dismiss her appeal in order to be considered for

3  Rule 35 post-conviction relief.  (Allenbaugh Decl. ¶ 7.)  AUSA

4  Julian explained that, as with entry into a cooperating plea

5  agreement, the government required waiver of a defendant's appeal

6  for a few reasons:  part of the defendant's cooperation would

7  have to involve an admission of wrongdoing and an acceptance of

8  her sentence; the government would not want to expend resources

9  to explore cooperation while at the same time having to expend

10  additional resources litigating defendant's claims on appeal; and

11  a cooperator who was litigating her own conviction or sentence

12  would not make a credible witness against another defendant.

13  (<u>Id.</u>)  Thereafter, AUSA Julian sent Mr. Allenbaugh a Post-

14  Conviction Agreement.  (<u>Id.</u>)

The Post-Conviction Agreement contained the following
provisions that outlined the discretionary nature of a Rule 35
motion based on substantial assistance:

> d)   If the USAO determines, <u>in its exclusive judgment</u>,
> that defendant has both complied with her obligations
> under this agreement and <u>provided substantial
> assistance to state or federal law enforcement in the
> prosecution or investigation of another</u> ("substantial
> assistance"), to move the Court pursuant to Rule 35 of
> the Federal Rules of Criminal Procedure for a reduction
> in defendant's sentence.
> . . . .

DEFENDANT'S UNDERSTANDINGS REGARDING
SUBSTANTIAL ASSISTANCE

> Defendant understands the following:
>
> . . . .
>
> b)   Nothing in this agreement requires the USAO or any
> other prosecuting or law enforcement agency to accept
> any cooperation or assistance that defendant may offer,
> or to use it in any particular way.

-7-

1

2

3

4

5

6

        c)   <u>At this time the USAO makes no agreement or
representation as to whether any cooperation that
defendant has provided or intends to provide
constitutes substantial assistance.  The decision
whether defendant has provided substantial assistance
rests solely within the discretion of the USAO.</u>

(Post-Conviction Agreement ¶¶ 5-6 (emphasis added), attached as
Exhibit B to Allenbaugh Decl. ¶ 8.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     Mr. Allenbaugh read through the entire Post-Conviction
Agreement with defendant, including the sections on the dismissal
of her direct appeal and the discretionary nature of the Rule 35
Motion. (Allenbaugh Decl. ¶ 8.) Mr. Allenbaugh also discussed
with defendant the pros and cons of entering into the Post-
Conviction Agreement. (<u>Id.</u>) Mr. Allenbaugh specifically related
to defendant that, under the agreement, the government did not
have to use defendant's cooperation or make a Rule 35 Motion;
and, if the government decided for whatever reason not to make
the Rule 35 Motion, defendant would not be able to get her direct
appeal rights back, <u>i.e.</u>, defendant would not be able to re-file
and pursue the direct appeal of her sentence. (<u>Id.</u>) Further,
Mr. Allenbaugh explained to defendant that defendant could still
file a 2255 Motion based upon ineffective assistance of counsel
within one year from the date that she dismissed her direct
appeal. (<u>Id.</u>) Ultimately, after discussing the Post-Conviction
Agreement at some length with Mr. Allenbaugh, defendant chose to
enter into the Post-Conviction Agreement and signed the agreement
on May 23, 2009. (Allenbaugh Decl. ¶¶ 8, 10.) In the signature
paragraph, defendant acknowledged that she reviewed all terms of
the Post-Conviction Agreement with her attorney, understood the
terms, and voluntarily agreed to the terms:

-8-

1        I have read this agreement and carefully discussed
every part of it with my attorney.  This agreement has

2   been read to me in Spanish, the language I understand
best, and <u>I have carefully discussed every part of it</u>

3   <u>with my attorney.  I understand the terms of this</u>
<u>agreement, and I voluntarily agree to those terms.</u>  My

4   attorney has advised me of the consequences of entering
into this agreement.  <u>No promises or inducement have</u>

5   <u>been made to me other than those contained in this</u>
<u>agreement.</u>  No one has threatened or forced me in any

6   way to enter into this agreement.  Finally, I am
satisfied with the representation of my attorney in

7   this matter.

8  Post-Conviction Agreement pp. 5-6 (emphasis added), attached as

9  Exhibit B to Allenbaugh Decl. ¶ 8.)  Mr. Allenbaugh also signed

10  the agreement, indicating that he had gone through the entire

11  agreement with defendant:

12        I am [defendant's] attorney.  I have carefully
discussed every part of this agreement with my client.

13   Further, I have fully advised my client of her rights
and of the consequences of entering into this

14   agreement.  To my knowledge, my client's decision to
enter into this agreement is an informed and voluntary

15   one.

16  (<u>Id.</u> at p. 6.)  Thereafter, Mr. Allenbaugh sent the signed Post-

17  Conviction Agreement back to AUSA Julian.  (Allenbaugh Decl.

18  ¶ 8.)  When Mr. Allenbaugh received a fully-executed copy of the

19  Post-Conviction Agreement, he sent a copy to defendant and her

20  boyfriend, Jason Tillery.  (<u>Id.</u> at ¶ 9.)  On or about May 27,

21  2009, pursuant to the Post-Conviction Agreement, Mr. Allenbaugh

22  filed a motion to dismiss Ms. Toscano's appeal.  (<u>Id.</u> at ¶ 8.)

23  The appeal was dismissed on or about June 12, 2009.  (<u>Id.</u>)

24     Mr. Allenbaugh then contacted AUSA Jeannie Joseph, who took

25  over the handling of defendant's case after AUSA Julian left the

26  U.S. Attorney's Office.  (Allenbaugh Decl. ¶ 11.)  On August 7,

27  2009, Mr. Allenbaugh met with AUSA Joseph to discuss defendant's

28  cooperation.  (<u>Id.</u>)  AUSA Joseph related that most of the

specific targets identified in the letter were already being
prosecuted or handled in the Federal Case or by the State, and
that the only viable area of cooperation was other, non-related
matters, which were generally referred to in the letter.  (Id.)
Mr. Allenbaugh discussed with AUSA Joseph everything that
defendant had related to him in terms of cooperation.  (Id.)
AUSA Joseph reiterated that these subjects all seemed to relate
to the Federal Case or State Case, and inquired whether defendant
had anything unrelated or more recent.  (Id.)  The meeting ended
by Mr. Allenbaugh agreeing to see if defendant had any additional
areas of potential cooperation.  (Id.)

On or about August 11, 2009, defendant was sentenced to six
years imprisonment in the State Case.  (Allenbaugh Decl. ¶ 12.)

After meeting with AUSA Joseph, Mr. Allenbaugh spoke with
defendant a few times to inquire about additional areas where
defendant potentially could provide cooperation.  (Allenbaugh
Decl., ¶ 13.)  However, defendant continued to provide the same
targets and schemes related to the Federal Case and State Case;
defendant was unable to provide information against other inmates
and declined to work in an undercover capacity.  (Id.)
Mr. Allenbaugh advised defendant, and Mr. Tillery, that if the
Rule 35 option did not work out, the deadline to file a 2255
appeal would be on or about June 12, 2010.  (Id.)

On May 7 and 11, 2010, Mr. Allenbaugh received emails from
defendant inquiring about her case.  (Allenbaugh Decl. ¶ 14.)
Defendant suggested in the emails that Mr. Allenbaugh communicate
with defendant thereafter by email given her limited access to
the telephone in jail.  (Id.)  Mr. Allenbaugh responded to

-10-

defendant's May 7, 2010 email the same day, advising defendant that he sent a copy of the Rule 35 (Post-Conviction Agreement) to her boyfriend and would like to set up a time to discuss her case with her.  (Id.)  Mr. Allenbaugh responded to defendant's May 11, 2012 email the following day, outlining her options now that she had been sentenced in the State Case.  (Id.)  Mr. Allenbaugh referenced prior discussions with defendant about whether to pursue the direct appeal of her sentence or take the Rule 35 option, and reminded defendant that defendant chose the Rule 35 option because the likelihood of success on her appeal was very slim:

> To be sure, if we had gone the direct appeal route, you would have exhausted your financial resources there with a very slim likelihood of a remand for resentencing.  Less than 5% of appeals result in a remand for resentencing and you could have ended up with the same sentence anyway upon remand.  The reason why I am explaining this to you is that the direct appeal most likely would not have resulted in anything (and we would still be waiting for the outcome of the appeal at this juncture; the 9th Cir. generally takes two years to decide an appeal, sometimes longer).  [¶] As you recall, I explained this to you which is why we decided on the Rule 35 route.

(Id.; 5/12/10 email attached to 2255 Motion.)  Mr. Allenbaugh related that defendant's best option was still the potential Rule 35 Motion and inquired whether there was "ANYTHING she could provide whether it is case related or not."  (Id.) Mr. Allenbaugh further explained that he would need cooperation information from defendant via a letter for the Rule 35 option.  (Id.)  Mr. Allenbaugh also noted that, as he had explained to Mr. Tillery, defendant's options at this point were limited – other than the potential Rule 35 Motion – to a 2255 Motion based on ineffective assistance of counsel.  (Id.)  Finally,

-11-

1  Mr. Allenbaugh explained to defendant how to file a 2255 Motion

2  pro se.  (Id.)

3      Defendant did not communicate with Mr. Allenbaugh until

4  approximately 10 months later, on or about March 3, 2011, when

5  Mr. Allenbaugh received an email from defendant.  (Allenbaugh

6  Decl. ¶ 15; 3/3/11 email attached to 2255 Motion.)  In the email,

7  defendant requested a copy of her appeal.  (Id.)  Mr. Allenbaugh

8  responded to defendant's email the same day, agreeing to send her

9  a copy of the appeal, but reminding her that she had dismissed

10  her appeal in order to pursue the Rule 35 option.  (Id.)  Mr.

11  Allenbaugh related that he previously had given a copy of the

12  Rule 35 (Post-Conviction Agreement) to Mr. Tillery, but would

13  mail another copy to defendant.  (Id.)  Mr. Allenbaugh also

14  related that defendant likely was out of time to file the 2255

15  Motion.  (Id.)

16      Approximately 10 months later, on or about January 17, 2012,

17  defendant filed the instant 2255 Motion.

18                          III.

19                     LEGAL ANALYSIS

20  **A.   Defendant's 2255 Motion Is Untimely and Should Be Dismissed**

21      1.   Defendant did not timely file within one year

22      Generally, a 2255 Motion has a "1-year period of

23  limitation," which runs from the "date on which the judgment of

24  conviction becomes final."  28 U.S.C. § 2255(f)(1).  In this

25  case, defendant's conviction became final on June 12, 2009, when

26  defendant dismissed her appeal.  Defendant was told by her

27  attorney, Mr. Allenbaugh, that if she wished to file a 2255

28  Motion, it needed to be filed within one year from the date her

                          -12-

1  appeal was dismissed, on or about June 12, 2010.  (Allenbaugh
2  Decl. ¶13.)   However, defendant did not file her § 2255 Motion
3  until January 17, 2012, more than one year after her conviction
4  became final.  As a result, her motion is time-barred and,
5  accordingly, should be dismissed.

6  Another possible commencement date for the limitations
7  period is one year from "the date on which the impediment to
8  making a motion created by governmental action in violation of
9  the Constitution or laws of the United States is removed, if the
10  movant was prevented from making a motion by such governmental
11  action."  28 U.S.C. § 2255(f)(2).  Defendant here claims
12  unconstitutional government interference with the filing of her
13  2255 Motion.  (2255 Motion p. 23.)  Specifically, defendant
14  claims that she did not file her 2255 Motion because she was
15  waiting for the government to file a Rule 35 Motion.  (Id.)

16  Defendant's argument lacks merit for a number of reasons.
17  First, although defendant dismissed her direct appeal pursuant to
18  the Post-Conviction Agreement, no where in the agreement did
19  defendant waive her right to file a 2255 Motion.  The government
20  requested no commitment on defendant's part in connection with a
21  2255 Motion.  Defendant could have filed a 2255 Motion and still
22  awaited a Rule 35 Motion by the government.  Second, the
23  declaration of Mr. Allenbaum makes clear that there was no
24  government action to foreclose defendant filing a 2255 Motion; to
25  the contrary, Mr. Allenbaum advised defendant that she could
26  still file a 2255 Motion, instructed her of the statute of
27  limitations period, and explained to her how she could file a
28  2255 Motion pro se.  (Allenbaugh Decl., ¶¶ 13-14.)  In short,

-13-

1   there was no unconstitutional governmental impediment here to

2   defendant's filing a 2255 Motion.

3        Another possible commencement date for the limitations

4   period is one year from "the date on which the facts supporting

5   the claim or claims presented could have been discovered through

6   the exercise of due diligence." 28 U.S.C. § 2255(f)(4).[2]

7   Defendant claims - perhaps on this basis - that she could not

8   have known her counsel was ineffective (in not getting her a Rule

9   35 Motion) until after the time period for filing a 2255 motion

10  had passed. (2255 Motion p. 23.) However, per the terms of the

11  Post-Conviction Agreement and as explained to defendant by

12  Mr. Allenbaugh, defendant was never guaranteed a Rule 35 Motion.

13  (Post-Conviction Agreement ¶¶ 5(d), 6(b), (c); Allenbaugh Decl.

14  ¶ 8.) As such, the government's decision not to file a Rule 35

15  Motion did not establish a newly discovered fact giving rise to

16  an ineffective assistance of counsel claim. Further, Mr.

17  Allenbaugh never lulled defendant into not filing a 2255 Motion

18  by reassuring her that a Rule 35 Motion already had been filed,

19  as defendant now seems to claim (2255 Motion p. 23); rather, Mr.

20  Allenbaugh confirmed that he had sent a copy of the Post-

21  Conviction Agreement to both defendant and her boyfriend.

22  (Allenbaugh Decl. ¶¶ 9, 14, 16; 5/7/10 email attached to 2255

23  Motion.) In short, there were no new facts that defendant

24  recently discovered giving rise to her claim of ineffective

25  assistance of counsel. The facts were the same, within the year

26  _____

27       [2] The last limitations period is based upon reliance on a
    new constitutional right (28 U.S.C. § 2255(f)(3)), which has no
28  relevance here.

1   following the dismissal of her appeal, and thereafter.

2          2.   Defendant is not entitled to equitable tolling

3          Defendant also is not entitled to any equitable tolling of

4   the limitations period that would render her untimely § 2255

5   Motion timely.  Although equitable tolling applies in the § 2255

6   context, see United States v. Battles, 362 F.3d 1195 (9th Cir.

7   2004), defendant is not eligible for such tolling.

8          To be eligible, a prisoner must demonstrate two facts.

9   First, there are "extraordinary circumstances beyond [the

10  defendant's] control that make it impossible to file a petition

11  on time."  Calderon v. United States Dist. Court (Beeler), 128

12  F.3d 1283, 1288 (9th Cir. 1997), overruled in part on other

13  grounds, Calderon v. United States Dist. Court (Kelly), 163 F.3d

14  530 (9th Cir. 1998) (en banc); accord United States v. Schwartz,

15  274 F.3d 1220, 1224 (9th Cir. 2001).  Second, "the extraordinary

16  circumstances were the cause of his untimeliness."  Laws v.

17  Lamarque, 351 F.3d 919, 922 (9th Cir. 2002) (quoting Spitsyn v.

18  Moore, 345 F.3d 796, 799 (9th Cir. 2003) (internal quotation

19  marks and citation omitted)).  This is an onerous burden, and one

20  the defendant bears.  See United States v. Marolf, 173 F.3d 1213,

21  1218 n.3 (9th Cir. 1999); accord Corjasso v. Ayers, 278 F.3d 874,

22  877 (9th Cir. 2002) (noting the "high hurdle" of proving

23  equitable tolling).

24         The Ninth Circuit has found equitable tolling to be

25  applicable in only a narrow class of cases, none of which is

26  implicated in this case.  See, e.g., Corjasso, 278 F.3d at 878-79

27  (district court erroneously dismissed a "mixed" habeas petition

28  and did not return documents to defendant that he would need to

-15-

1  file timely habeas petition); <u>Miles v. Prunty</u>, 187 F.3d 1104,

2  1107 (9th Cir. 1999) (prison officials improperly handled habeas

3  petition and caused it to be filed late); <u>Lott v. Mueller</u>, 304

4  F.3d 918, 922-25 (9th Cir. 2002) (prison officials denied

5  defendant access to his legal files); <u>Lamarque</u>, 351 F.3d at 923-

6  24 (defendant's mental incompetence).

7      Notably, reliance on bad advice from counsel does <u>not</u> toll

8  the limitations period.  <u>See</u> <u>Miranda v. Castro</u>, 292 F.3d 1063,

9  1067-68 (9th Cir.), <u>cert. denied</u>, 537 U.S. 1003 (2002); <u>Frye v.</u>

10 <u>Hickman</u>, 273 F.3d 1144, 1146 (9th Cir. 2001), <u>cert. denied</u>, 535

11 U.S. 1055 (2002).

12     For all these reasons, this Court should dismiss defendant's

13 2255 Motion as untimely.

14 **B.  Defendant Has Not Met the <u>Strickland</u> Test to Establish**

15     **Ineffective Assistance of Counsel**

16     1.  <u>The standard of review is highly deferential</u>

17     Whether a defendant's ineffective assistance of counsel

18 claim has merit is determined by the two-pronged test established

19 in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  Specifically,

20 a convicted defendant seeking to overturn her sentence for

21 ineffective assistance of counsel must show that (1) "counsel's

22 representation fell below an objective standard of

23 reasonableness" and (2) there is a "reasonable probability that,

24 but for counsel's unprofessional errors, the result of the

25 proceeding would have been different."  <u>Strickland</u>, 466 U.S. at

26 687-88, 694.

27     In evaluating whether counsel's representation fell below an

28 objective standard of reasonableness, the "deficient" performance

-16-

must be "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." Strickland, 466 U.S. at 687-688.  Determining deficiency is a high standard, as "[j]udicial scrutiny of counsel's performance must be highly deferential . . . .  [Courts] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] counsel is strongly presumed to have . . . made all significant decisions in the exercise of reasonable professional judgment." Id. at 689-90.  See also United States v. Claiborne, 870 F.2d 1463, 1468 (9th Cir. 1989) ("In applying the first prong [of Strickland], it is clear that a reviewing court is not free to engage in after-the-fact second guessing of strategic decisions made by defense counsel. Instead, judicial scrutiny of counsel's performance must be highly deferential" (citations omitted)).  Moreover, courts must assess counsel's overall performance throughout the case, rather than one specific act or omission, to determine reasonable professional assistance. Kimmelman v. Morrison, 477 U.S. 365, 386 (1986) ("Since there are countless ways to provide effective assistance in any given case, unless consideration is given to counsel's overall performance, before and at trial, it will be all too easy for a court, examining counsel's defense after it has proven unsuccessful, to conclude that a particular act or omission was unreasonable" (citations and quotations omitted)). Thus, the reasonableness of counsel's performance is to be evaluated at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential. Strickland, 466 U.S. at 689.

2.   <u>Mr. Allenbaugh's performance was not unreasonable or
     deficient</u>

Giving deference to the strategic decisions of
Mr. Allenbaugh, and considering the particular circumstances of
the defense, counsel's assistance was not unreasonable or
deficient.  First, the likelihood of defendant's success on a
direct appeal of her sentence was low.  Sentencing was heavily
litigated and the Court used a conservative calculation of actual
loss, did not apply all sentencing enhancements, and gave
defendant a low-end guideline sentence.  (<u>See generally</u> Criminal
Minutes Re: Sentencing.)  Further, the Court noted that it would
have applied the same sentence without regard to the Guidelines.
(<u>Id.</u> at p. 9.)  Thus, the assessment of Mr. Allenbaugh, who
specializes in federal white collar criminal defense and
sentencing, that defendant had a low likelihood of success on
appeal and Rule 35 cooperation posed a greater chance for
reduction of her sentence, was reasonable.  (Allenbaugh Decl.
¶¶ 2, 4.)

Second, it is clear that Mr. Allenbaugh acted diligently in
ensuring that defendant's decision to dismiss her appeal and
pursue Rule 35 cooperation was an informed and voluntary
decision.  Mr. Allenbaugh went through each term of the Post-
Conviction Agreement with defendant and discussed the
alternatives at length with defendant, including the fact that a
Rule 35 Motion by the government was discretionary.  (Allenbaugh
Decl. ¶¶ 4, 6, 8, 10.)  Further, it is clear from the Post-

-18-

Conviction Agreement itself[3] that defendant understood a Rule 35 motion was within the government's discretion.  (Post-Conviction Agreement ¶¶ 5(d), 6(b), (c).)  Defendant chose to pursue the potential for Rule 35 cooperation and dismiss her appeal. (Allenbaugh Decl. ¶¶ 6, 8, 10.)

Third it is clear that Mr. Allenbaugh reasonably pursued a Rule 35 Motion for defendant based on cooperation.  Mr. Allenbaugh inquired of defendant multiple times about any cooperation that she could provide the government.  (Allenbaugh Decl. ¶ 6, 13-14, 16.)  Mr. Allenbaugh wrote to and met with the government to relay that cooperation.  (Id. at ¶¶ 6, 11.) Defendant continued to provide the same targets and schemes related to the Federal Case and State Case, was unable to provide information against other inmates, and declined to work in an undercover capacity.  (Id. at ¶ 13.)

Fourth, it is clear that Mr. Allenbaugh adequately advised defendant regarding her remaining 2255 Motion option.  Nothing in the Post-Conviction Agreement prevented defendant from filing a 2255 Motion.  Mr. Allenbaugh advised defendant that she would need to file a 2255 Motion based on ineffective assistance of counsel within a year from the date that her appeal was dismissed.  (Allenbaugh Decl. ¶¶ 8, 13-14; 5/12/10 email.) Specifically, in a May 12, 2012 email, Mr. Allenbaugh reiterated to defendant the reasons defendant chose to dismiss her appeal to pursue Rule 35 cooperation, inquired whether defendant could

---

[3]   Defendant also acknowledged that the Post-Conviction Agreement was read to her in Spanish in her signature paragraph.

-19-

provide anything further in terms of cooperation, reminded
defendant of the 2255 Motion option, and explained how defendant
could file the 2255 Motion pro se.  (5/12/10 email.)  Yet,
defendant then let 10 months lapse before she responded to Mr.
Allenbaugh's email, and then only to request a copy of her appeal
papers.  (Allenbaugh Decl. ¶ 15; 3/3/11 email.)  In response, Mr.
Allenbaugh again mentioned possible cooperation by defendant, but
advised defendant that, at this point, she may be out of time to
file a 2255 Motion.  (<u>Id.</u>)

In sum, it appears that Mr. Allenbaugh reasonably assessed
that defendant's best chance to reduce her sentence was the Post-
Conviction Agreement and reasonably pursued cooperation.
However, defendant failed to provide any substantial assistance
to the government.  This does not establish ineffective
assistance of counsel and, as such, defendant's 2255 Motion
should be denied.

3.   <u>There is no reasonably probability of a different
     result</u>

Even if defendant could establish that Mr. Allenbaugh's
performance was so unreasonable and deficient as to meet the
<u>Strickland</u> test  (which she cannot, as set forth above),
defendant cannot established that the result - her sentence -
would have been different had she had different counsel.
Sentencing was heavily litigated and the Court used a
conservative calculation of actual loss, did not apply all
sentencing enhancements, and gave defendant a low-end guideline
sentence.  Further, the Court noted that it would have applied
the same sentence without regard to the Guidelines.  Thus, had

-20-

defendant not dismissed her appeal, it would have had little
chance of resulting in a reduction of her sentence before the
Ninth Circuit or before this Court on remand.

**C.    Defendant Has Not Established Misconduct By The Government**

Defendant offers nothing but conjecture that Mr. Allenbaugh
colluded with the government to deprive defendant of her direct
appeal rights in entering into the Post-Conviction Agreement.
(2255 Motion pp. 20-22.)  Mr. Allenbaugh denies any such
collusion.  (Allenbaugh Decl. ¶ 10.)  According to Mr.
Allenbaugh, it was his idea to pursue Rule 35 cooperation given
that defendant had little chance of success through a direct
appeal of her sentence.  (Id. at ¶¶ 6, 10.)  In response to Mr.
Allenbaugh's offer of post-conviction cooperation, AUSA Julian
provided a Post-Conviction Agreement.  (Id. at ¶ 7.)  The terms
of the Post-Conviction Agreement, including the discretionary
nature of the Rule 35 Motion, were clearly set forth and mirrored
the language of a typical cooperating plea agreement.  Defendant
knowingly and voluntarily entered into the Post-Conviction
Agreement.  (Id. at ¶¶ 8, 10.)  Thereafter, the government
consulted with case agents and the State prosecutor regarding
potential areas of cooperation by defendant.  (Id. at ¶ 11.)  The
government also met with Mr. Allenbaugh and discussed potential
avenues for cooperation by defendant.  (Id.)  The cooperation
defendant sought to provide continued to relate to targets
already being prosecuted or handled in the Federal Case or by the
State, and defendant offered nothing unrelated or recent.  (Id.
at ¶¶ 11, 13-14.)  As such, the government determined that
defendant could not offer substantial assistance.  There was no

-21-

1    government misconduct.

2                              IV.

3                           CONCLUSION

4        For all the foregoing reasons, and in light of the

5    aforementioned authorities, the government respectfully requests

6    that the Court deny defendant's 2255 Motion.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### DECLARATION OF MARK H. ALLENBAUGH

I, Mark H. Allenbaugh, hereby declare as follows:

1.    My prior firm, Allenbaugh Samini Ghosheh, LLP, was retained as counsel to represent defendant OLGA LILIA TOSCANO: (1) in or around June 2009, in connection with <u>People v. Toscano, et al.</u>, 08ZF0025, a California state case charging Ms. Toscano with  fraud, grand theft, and conspiracy, (the "State Case"); and (2) in or around July 2008, in connection with a related federal case where Ms. Toscano had already been convicted, <u>United States v. Millennium, et al.</u>, No. SA CR 04-281-AHS (the "Federal Case"). My firm handled the sentencing and appeal.  The appeal was subsequently withdrawn.  I was the supervising attorney on all matters, and was counsel of record on the appeal.  I make this declaration in response to Ms. Toscano's ineffective assistance of counsel claims set forth in her Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 ("2255 Motion"), in <u>Toscano v. United States</u>, No. SA CV 12-78-AHS.

2.    I am an attorney at law licensed to practice in the States of Maryland and Virginia, and in the District of Columbia, and am the founding partner of the Law Offices of Mark H. Allenbaugh.  One of my specialized practice areas is federal white collar criminal defense and sentencing.  I am admitted to practice before several U.S. District Courts, the U.S. Courts of Appeals for the Fourth, Fifth, Sixth, and Ninth Circuits, and the U.S. Supreme Court.  I have served as the Chair of the Federal Sentencing Guidelines Task Force for the District of Columbia Chapter of the Federal Bar Association, Co-Chair of the Federal

-1-

Sentencing Guidelines Committee for the National Association of Criminal Defense Lawyers, and am a member of the American Bar Association's Corrections and Sentencing Committee.  I also am co-editor of <u>Sentencing, Sanctions, and Corrections: Federal and State Law, Policy, and Practice</u> (2d ed., Foundation Press, 2002). Prior to entering private practice, I served as Staff Attorney for the U.S. Sentencing Commission where I was assigned to the Economic Crimes Policy Team.  I have published numerous articles on sentencing policy and criminal justice.  I have handled hundreds of criminals cases representing defendants charged with and/or convicted of federal crimes, including handling their appeals.

3.    My prior firm and I were retained to represent Ms. Toscano in post-conviction matters in the Federal Case.  A partner at my former firm, Mr. Donald (Andy) Purdy, also was assigned to work on Ms. Toscano's Federal Case.  Ms. Toscano received a 78 month sentence in her federal case.  Mr. Babak Samini was assigned to her state case.  Ms. Toscano received a sentence of 72 months in the state case, to be served concurrent with her federal sentence, of which she will have to serve far less than that period of time in light of recent state prison realignment legislation.  Given that Ms. Toscano was incarcerated, I communicated with her in person and by phone, and later by email through CorrLinks.  I also communicated to her through her boyfriend, Jason Tillery.

4.    When I was retained, I reviewed the trial and sentencing records in Ms. Toscano's Federal Case for any potential appellate issues.  I found no appealable trial errors

-2-

to challenge Ms. Toscano's conviction.   Thus, I determined that
the only possible avenue of appeal was a general appeal of the
reasonableness of Ms. Toscano's 78-month sentence.   I conferred
with Ms. Toscano about my findings.   I further related to
Ms. Toscano that, given the discretion judges are allowed at
sentencing, an appeal of her sentence had only a very slim
likelihood of resulting in a remand for re-sentencing, and that
typically the Ninth Circuit takes two years to decide an appeal,
and it could take longer.   Ms. Toscano decided to have me file
(on her behalf) an appeal of the reasonableness of her sentence.

    5.    On or about April 29, 2009, I filed an appeal of
Ms. Toscano's sentence based upon:   the irrationality of
Sentencing Guidelines Section 2B1.1, the evidentiary standard
applied at Ms. Toscano's sentencing, the calculation of loss, and
the applicability of 18 U.S.C. § 3553 factors.

    6.    Given my assessment of Ms. Toscano's unlikely chance of
success on her appeal, I suggested to her that she try to provide
cooperation to the government to obtain a post-conviction
reduction in her sentence pursuant to Rule 35 of the Federal
Rules of Criminal Procedure ("Rule 35 Motion").   Ms. Toscano was
interested in pursuing this.   Thus, I questioned Ms. Toscano
about any subject on which she could provide cooperation to the
government of criminal wrongdoing by others, both related to the
State Case and Federal Case, and unrelated matters.   Thereafter,
I contacted the Assistant United States Attorney ("AUSA") who
handled her case, Kenneth B. Julian, and outlined the potential
cooperation that Ms. Toscano could provide to the government.
The potential cooperation I outlined included a specific list of

-3-

targets related to the Millennium scheme charged in the State Case and Federal Case, as well as "further information of individuals and organizations unrelated" to the State Case and Federal Case.  Attached hereto as Exhibit A is a true and correct copy of a letter dated May 4, 2009 that I sent to AUSA Julian in this regard.

7.   AUSA Julian responded to my letter, indicating that he was interested in potential cooperation by Ms. Toscano, but that Ms. Toscano would have to enter into a Post-Conviction Agreement and dismiss her appeal in order to be considered for Rule 35 post-conviction relief.  AUSA Julian explained that, as with entry into a cooperating plea agreement, the government required waiver of a defendant's appeal for a few reasons:  part of the defendant's cooperation would have to involve an admission of wrongdoing and an acceptance of her sentence; the government would not want to expend resources to explore cooperation while at the same time having to expend additional resources litigating defendant's claims on appeal; and a cooperator who was litigating her own conviction or sentence would not make a credible witness against another defendant.  Thereafter, AUSA Julian sent me a Post-Conviction Agreement.

8.   I read through the entire Post-Conviction Agreement with Ms. Toscano, including the sections on the dismissal of her appeal and the discretionary nature of the Rule 35 Motion.  I also discussed with Ms. Toscano the pros and cons of entering into the Post-Conviction Agreement.  I specifically related to Ms. Toscano that, under the agreement, the government did not have to use Ms. Toscano's cooperation or make a Rule 35 Motion;

-4-

and, if the government decided for whatever reason not to make the Rule 35 Motion, defendant would not be able to get her appeal rights back, _i.e._, we would not be able to re-file and pursue a direct appeal of her sentence.  However, I explained to her that she could still file a 2255 Motion based upon ineffective assistance of counsel within one year from the date she dismissed her appeal.  Ultimately, after discussing the Post-Conviction Agreement at some length, Ms. Toscano chose to enter into the Post-Conviction Agreement and dismiss her appeal.  Thereafter, I sent the Post-Conviction Agreement signed by Ms. Toscano and myself back to AUSA Julian and filed a motion to dismiss Ms. Toscano's appeal.  Attached hereto as Exhibit B is a true and correct copy of the Post-Conviction Agreement signed by Ms. Toscano and myself on May 23, 2009.  Attached hereto as Exhibit C is a true and correct copy of the Motion to Dismiss Appeal that I filed on Ms. Toscano's behalf on or about May 27, 2009.  Attached hereto as Exhibit D is a true and correct copy of the order dismissing Ms. Toscano's appeal dated June 12, 2009.

9.   When AUSA Julian sent back to me a fully-executed copy of the Post-Conviction Agreement, I sent a copy to Ms. Toscano and Mr. Tillery.

10.   The government did not suggest the Rule 35 Motion in exchange for a dismissal of Ms. Toscano's appeal, nor did I collude with the government to obtain Ms. Toscano's dismissal of her appeal.  I suggested the idea because I had determined, based upon my experience and all the circumstances of Ms. Toscano's case, particularly the fact that Ms. Toscano was unlikely to prevail on her appeal, that the Rule 35 Motion was Ms. Toscano's

-5-

best chance for a reduction in her sentence.  However, the decision to enter into the Post-Conviction Agreement and waive her appeal was Ms. Toscano's.

11.   Shortly after Ms. Toscano entered into the Post-Conviction Agreement, AUSA Julian left the U.S. Attorney's Office and AUSA Jeannie Joseph took over the handling of Ms. Toscano's case.  I spoke with AUSA Joseph by telephone about meeting to discuss Ms. Toscano's cooperation.  I met with AUSA Joseph at her office on or about August 7, 2009 to discuss Ms. Toscano's cooperation.  AUSA Joseph related to me that, in preparation for the meeting, she had reviewed Ms. Toscano's proffer that took place on November 17, 2004, prior to the trial in the Federal Case.  AUSA Joseph also related that she had gone through the specific items listed in my May 4, 2009 letter regarding Ms. Toscano's cooperation with the case agents in the Federal Case and the prosecutor in the State Case.  AUSA Joseph related that most of the specific targets identified in the letter were already being prosecuted or handled in the Federal Case or by the State.  AUSA Joseph related that the only viable area of cooperation was other, non-related matters, which were generally referred to in the letter.  I discussed with AUSA Joseph everything that Ms. Toscano had related to me in terms of cooperation.  AUSA Joseph reiterated that these subjects all seemed to relate to the Federal Case or State Case, and inquired whether Ms. Toscano had anything unrelated or more recent.  We ended the meeting by my agreeing to see if Ms. Toscano had any additional areas of potential cooperation.

-6-

12.   On or about August 11, 2009, defendant was sentenced to six years imprisonment in the State Case.

13.   After my meeting with AUSA Joseph, I spoke with Ms. Toscano a few times to inquire about additional areas where she potentially could provide cooperation.  However, Ms. Toscano continued to provide the same targets and schemes related to the Federal Case and State Case.  Ms. Toscano was unable to provide information against other inmates and declined to work in an undercover capacity.  I advised Ms. Toscano, and Mr. Tillery, that if the Rule 35 option did not work out, the deadline to file a 2255 appeal would be on or about June 12, 2010.

14.   On May 7 and 11, 2010, I received emails from Ms. Toscano inquiring about her case.  Ms. Toscano suggested in the emails that we communicate thereafter by email.  I responded to her May 7, 2010 email the same day, advising her that I sent a copy of the Rule 35 (Post-Conviction Agreement) to her boyfriend and would like to set up a time to discuss her case with her.  I responded to her May 11, 2012 email the following day.  In the email, I outlined her options, now that she had been sentenced in the State Case.  I referenced our prior discussions about whether to pursue the direct appeal of her sentence or take the Rule 35 option, and reminded her that she chose the Rule 35 option because the likelihood of success on her appeal was very slim.  I related that her best option was still the potential Rule 35 Motion and inquired whether there was "ANYTHING she could provide whether it is case related or not."  I further explained that I would need information regarding potential cooperation from Ms. Toscano via a letter for the Rule 35 option.  I also noted that,

-7-

as I had explained to Mr. Tillery, her options at this point were limited - other than the potential Rule 35 Motion - to a 2255 Motion based on ineffective assistance of counsel.  Finally, I explained to Ms. Toscano how to file a 2255 Motion pro se.

15.  I did not hear from Ms. Toscano again until approximately 10 months later, on or about March 3, 2011, when I received an email.  In the email, Ms. Toscano requested a copy of her appeal.  I responded to Ms. Toscano's email the same day, agreeing to send her a copy of the appeal, but reminding her that she had dismissed her appeal in order to pursue the Rule 35 option.  I related that I previously had given a copy of the Rule 35 (Post-Conviction Agreement) to Mr. Tillery, but would mail another copy to her.  I also related that she likely was out of time to file the 2255 Motion.

16.  I never related to Ms. Toscano that the government had filed a Rule 35 Motion and promised to send her a copy.  To the contrary, in my communications with her, I repeatedly requested information relating to her cooperation so that I could present that information to the government for consideration of a Rule 35 Motion.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 20th day of April, 2012 in Ohio.


_____/s/_____
MARK H. ALLENBAUGH
Assistant United States Attorney


-8-